[S. F. No. 13607. In Bank.—May 1, 1931.]

HENRY PETERSEN, Plaintiff and Respondent, v. C. F. KLITGAARD, Defendant and Respondent; NAKNEK PACKING COMPANY (a Corporation), Defendant and Appellant.

F. V. Keesling and C. A. S. Frost for Appellant.

Daniel A. Ryan, Bronson, Bronson & Slaven, Thomas C. Ryan and George·F. Snyder for Respondent.

SEAWELL, J.—This appeal was taken from a judgment entered upon the verdict of a jury in favor of plaintiff and against defendant Naknek Packing Company, a corporation, in the sum of $15,000 on account of personal injuries sustained April 25, 1927, by plaintiff by falling through a hatchway of appellant's steamship "Hyades", as the result of appellant's alleged negligence, while he was employed as a stevedore in loading said steamship as she was docked in the San Francisco harbor making ready to engage in the fish cannery enterprise conducted in Alaska by said company. The other defendant, C. F. Klitgaard, prevailed in the trial court against plaintiff, hence the appeal is prosecuted solely by said Naknek Packing Company.

The cause is before us on an order of transfer, it having been first passed upon by the District Court of Appeal, First Appellate District, Campbell, J., *pro tem.*, writing the decision of the court (291 Pac. 283), wherein it was held decisive of the case that the Jones Act made the Federal Employers' Liability Act (45 U. S. C. A., secs. 51–59) the rule of decisions in actions by employees for personal injuries resulting from maritime service to their employers, and inasmuch as respondent Petersen was not the servant or employee of the appellant packing company, but was the servant and employee of Klitgaard, respondent had no cause of action against appellant ship owner. This being so, no other or further points presented upon appeal were considered.

Appellant Naknek Packing Company, owner of the "Hyades" steamship, is a corporation organized and existing under and by virtue of the laws of the state of California, with its principal place of business in the city and county of San Francisco. The steamship "Hyades" was built in

1900. The vessel is 332 feet long, with a forty-seven feet six inches beam, and the net tonnage is 2,668 tons. The hull, decks, hatch coamings and strongbacks are of steel construction. Her crew complement consists of five or six officers and thirty-two men. Five of her six hatches were in use. She was usually laid up at the Alameda County docks during the winter months and in March or April was made ready to put off for the Alaska fish canneries trade carrying a cargo, returning to her home port in August or September of each year.

C. F. Klitgaard, an experienced and certified master stevedore, contracted orally with the Naknek Packing Company a few days prior to the accident to load the vessel, furnishing his own crew, on a ''cost plus 20 per cent'' basis. He had loaded her once a year or more before. The hatch covers consisted of rather heavy timbers. The hatch through which respondent fell was known as hatch No. 4. Its cover or timbers had been placed by Klitgaard's crew on this hatch on the Saturday afternoon preceding Monday, the day on which the accident occurred. The hatch seemed not to have been disturbed in the interim. On the Monday morning in question at about 9 o'clock respondent Peterson, who had been working on the dock hauling cargo and placing it alongside the ship, and another member of the crew named Otto Flinkenberg, were ordered by one of Klitgaard's men in authority, to go down into hold or hatch No. 4 and get some slings. There seems to have been some momentary delay in the execution of the order, whereupon the officer in charge became impatient and addressed Petersen and Flinkenberg in a loud and commanding voice interspersed with oaths to go into the hold and bring out the slings. The timbers or planks which covered the hatches—referred to in nautical terms as hatch covers—were also covered over with one or two heavy tarpaulins. About the openings or hatches there is constructed a rectangular metal coaming which rises from the deck level two and one-half or three feet. The hatches also have spanning them steel beams which are called strongbacks. The strongbacks and coamings carry the weight of the hatch covers or timbers and also the heavy tarpaulin which is spread over the hatchway to protect the cargo beneath from rain and against the heavy seas which sometimes break over the vessel. The ends of the covers rest upon

flanges or metal lips which project from the coamings and strongbacks. In this manner the hatches are bridged over. The distance between the coamings and strongbacks was about six feet eight inches. The timbers or hatch covers— provided the sides of the coaming and strongbacks are in line—should be a fraction of an inch under that length. In haste Flinkenberg and Petersen, under imperious commands, made their way to the deck of the vessel and to hatch No. 4, and from the aft end of the hatch rolled back the tarpaulin and peered through the cracks of the hatch covers in an effort to locate the iron ladder. Satisfying themselves that it·· was at the forward end of the hatch, Flinkenberg started forward on the deck while Peterson stepped upon the hatch cover in order to make haste in reaching the forward end and to better remove the tarpaulin. Upon taking his second step a board or cover of the hatch gave way and he was precipitated some fourteen feet below, striking upon tin plate and wood, thereby sustaining very serious and damaging injuries.

Plaintiff in maintaining his action had three courses open to him. He could proceed *in rem* against the vessel, *in personam* in the admiralty court, or *in personam* at common law in the state court. (*Pottage* v. *Luckenbach Steamship Co.*, 206 Cal. 622 [275 Pac. 410].) He chose to proceed at common law in the state court.

The allegations of the complaint on which negligence is charged are to the effect that the hatch covers or planks which were furnished by the Naknek Packing Company were too short and inadequate for the purpose for which they were used. It is the settled law that it is the duty of the owner of a ship to furnish stevedores working thereon a reasonably safe place to work. Independent of the question that plaintiff was the employee of the co-defendant Klitgaard, the Naknek Packing Company would be liable to plaintiff if the hatch covers were inadequate and insufficient for the purpose for which they were designed, and such inadequacy or insufficiency was the proximate cause of plaintiff's injuries. The jury acquitted defendant Klitgaard of any culpability in the matter, and the question of the ship owners' liability, so far as the sufficiency of the evidence to sustain the judgment against it on the grounds above pointed out is concerned, must be determined in the light of the

evidence presented by the record, of all of which we have made a full and thorough examination. ■ Our purpose is to make but brief mention of the evidence which, we are of the opinion, would be amply sufficient to support the finding of the jury as to the unfitness or insufficiency of said hatch covers, or many of them, in compliance with the familiar rule, reaffirmed in *Dewhirst* v. *Leopold,* 194 Cal. 424 [229 Pac. 30] ; *Gett* v. *Pacific Gas & Elec. Co.,* 192 Cal. 621 [221 Pac. 376], and many other cases, to the effect that if there is any substantial evidence to sustain the jury's verdict we have no right to arbitrarily repudiate the jury's judgment and substitute our own in its stead, even if we should be so inclined.

It is conceded that the vessel had been in the service twenty-seven years. Its coaming had become bent out of alignment to the degree that the hatch covers that were used in the center were too short for either side and would fall through unless placed in their particular position in the center. The lips or flanges upon which the covers rested were but one and one-half inches, or something less, in width, whereas the flanges of the modern steamship are not less than two and one-half inches in width and measure as high as three and one-half and four inches. A number of witnesses, both for the plaintiff and defendants, testified that the condition of the hatch covers was very bad. The ends had become rounded from wear and the part which rested upon the lips had become badly worn and many were split and slivered, and too short to reach safely from side to side. They varied in thickness, length and width. If those which were used in the middle area were placed elsewhere they were too short and were liable to fall upon the slightest pressure. The variance in length in the standard length of six feet and six inches was one and one-quarter inches. Charles Bohlan, the ship's carpenter, called on behalf of the ship's owner, testified that he did repair work on the hatch covers during the last part of March or the forepart of April, 1927. He testified that when he finished the job they were good. The condition of the hatches, from his own description of them after he had finished the repair work, is not left in doubt. He said he "tinkered with the old boards, refastening them with new bolts". On one of the old boards with a broken end he did no work. The bend in the coaming

was not corrected. It was out of line one and a quarter inches from the center to each end. The strongbacks gave a little from forward to aft and from aft to forward. Some of the covers, he testified, which were worn out, too short or split were cast aside. He took other old covers that were split and bolted them together again. On the day of the accident all of the covers differed in width; they had to differ in length. In view of the contention by the packing company that the hatch covers were adequate, but had not been properly placed by Klitgaard's men the preceding Saturday, and as indicating the witnesses' knowledge as to the actual condition of the hatch coverings as to safety, the following statement of the ship carpenter made near the conclusion of his testimony is suggestive of his doubts: "At the time Mr. Petersen went on top of that hatch they might have been in their proper places and they might have not." If they were in their proper places, it is the contention of the ship owner, the accident could not have happened. The ship carpenter's statement tends to directly challenge the claim. All of Klitgaard's crew of stevedores who handled the hatch covers before the accident and critically examined them thereafter testified that a great many of them were badly worn where the ends rested on the metal lips, rounded and slivered at the corners, and too short for the spaces they were supposed to fill. They were too short, likely to fall through, and created a dangerous situation. In fact, the testimony of the ship's crew is but mildly in aid of the contrary claim that they were in a fair condition. A hatch cover was found in the hold near where Petersen fell immediately thereafter, but its identity as a misplaced plank, an act chargeable to the stevedores, was a question attended with uncertainty and open to dispute. It showed much wear, its corners being badly worn, and it was not of adequate length. But even if the fact is as defendant packing company insists, that alone would not have been conclusive as to the negligence of the ship owners, inasmuch as there are other elements to be considered, among them the hatch covers which varied in length sufficiently to create a dangerous situation, but yet so slightly that the eye would not readily discern the difference, and the further fact that the ship's officer, with full knowledge of the situation, stood by and observed the replacing of the covers by the

stevedores and failed to impart any information or give any warning as to the existing difference in the lengths of the hatch covers or as to the other fact, doubtless unknown to the stevedore crew, that the coaming of the vessel was out of alignment, notwithstanding his authority and duty of supervision in the premises.

The steamship "Hyades" was inspected six days before the accident and the certificates of inspection showed her to be seaworthy, but no mention was made of her hatches. There is nothing in the evidence which will bear the construction that the hatch covers were specifically inspected by any inspector. In fact, the person who inspected the vessel as to her seaworthiness and general condition had no recollection as to her hatch coverings, and it is probable he did not examine them, inasmuch as the law did not require it. Had he done so, unless the testimony of a number of witnesses who described their condition is to be disbelieved, he could not have given them his approval. The testimony of M. A. Larsen, master of the vessel, is to the effect that just before the vessel went into the shipyards in 1927, he marked the after tier of covers by painting a red stripe about three inches wide across them; the middle section was marked with a green stripe, and the forward section with a white stripe, and the paint was still fresh when the accident occurred. This was done, according to the witness, so one could see from the deck if the hatch coverings were in line and therefore in their proper places. In 1928 he claims to have repainted the lines. After the accident numerals were painted upon the hatch covers to properly identify each with respect to the position on the hatchways. A number of witnesses testified that no paint lines or other distinguishing marks of any kind were on the hatch covers at the time of or prior to the accident. No claim is made that the hatch covers were ever marked in any way until April, 1927, a few days prior to the accident.

Several witnesses were called by the packing company and photographs were produced, to show the condition of the vessel and hatch covers as they existed more than a ·year after the accident. It appears in evidence that the life of a hatch cover under ordinary use does not exceed one year. Whether the condition as shown by a photo-

graph taken more than a year after answer filed reflects the condition as it existed at the time of the accident is a matter for the jury's consideration. No hatch covers were produced in court. ■ That the officer of the ship, whether master or mate, is at all times in full charge of the vessel when she is docked, and has supervision of the deck and hatchways and the coverings thereof there is no question. There is some difference of opinion between seafaring men as to whether the officer of the ship is charged with the mere duty of seeing to it that the hatches are closed, or whether his duty also extends to seeing that they are, in a strict sense, properly closed. His duty depends upon the situation. Latent defects or infirmities known to him but unknown to those performing the act, which required the work to be done in a particular manner to avoid probable injuries to others would furnish a sufficient reason for making it his duty to see to it that the work has been done in a manner insuring safety to others. As to whether or not the stevedore crew, who are not familiar with defects not apparent and which in the performance of their employment may result in serious personal injury to others unless special care is taken to avoid them, should be informed of such defects by the officer in charge, there can be no doubt. It is the duty of a master of a ship to give notice to stevedores of any latent defect in its hatches. (*Frederick Leyland & Co.* v. *Holmes*, 153 Fed. 557.)

■ Neither are we of the view that Petersen was guilty of contributory negligence as a matter of law in stepping upon the hatch in going to the other end to turn back the tarpaulin and take off the hatch covers. There is evidence in the case that it is not unusual, and certainly it is not forbidden, for a stevedore to step upon the hatch for such purposes. A hatch is built to sustain great weight. Many tons of water beat upon it and the ship's load largely goes into the hold through the hatchways. There is testimony in the case that the hatch covers were put down in the order in which they were taken off. The captain of the ship testified that the mate who was present when the hatch covers were put on, watching the operation, told him that the hatches were "put on in the right way". ■ The relation of master and servant in

the ordinary sense does not exist in the instant case and the marine law does not apply. (*Pottage* v. *Luckenbach*, 206 Cal. 622 [275 Pac. 410].) The complaint states a cause of action for negligence according to the rules of the common law and the plaintiff elected to bring an action *in personam* on the common-law side of the state court.

█ The several instructions which the trial court gave the jury to the effect that the rule of comparative negligence was applicable in a common-law action as applied in the courts of California was misleading and unquestionably prejudicial to defendant Naknek Packing Company. No such rule was known at common law. Contributory negligence, if proved, would constitute a complete defense to the action. █ The plaintiff took no appeal from the judgment in favor of defendant Klitgaard. His right to recover must therefore rest upon his ability to show that his injuries are the proximate result of the negligence of the Naknek Packing Company, owner of said steamship ''Hyades''. The rules of pleading and proving contributory negligence are thoroughly established by numerous decisions of the courts of this state and we do not feel that it is necessary to review the law on that subject. Any just criticism made to the instructions as to contributory negligence so far as they affect appellant will doubtless be heeded upon a re-examination of the subject.

The foregoing sufficiently covers all major questions argued by appellant in the brief. Appellant was not unduly limited or deprived of making any and every defense which was legally available to it.

For the reasons above assigned the judgment is reversed, and it is so ordered.

Richards, J., Waste, C. J., Shenk, J., Curtis, J., and Langdon, J. concurred.

Rehearing denied.